**IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
CENTRAL DIVISION**

| | | |
|---|---|---|
| JULIE A. FALL, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 08-4118-CV-C-NKL |
| | ) | |
| MICHAEL B. DONLEY, Secretary of the | ) | |
| Air Force, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER

Plaintiff Julie A. Fall ("Fall") brings this pro se action for employment discrimination and retaliation against Defendant Michael B. Donley, Secretary of the Air Force ("Air Force"). Before the Court is the Air Force's motion for summary judgment [Doc. # 48]. For the following reasons, the Court grants the motion.

## I.      Factual Background[1]

In 2001, Fall began working for the Air Force at Whiteman Air Force Base in Knob Noster, Missouri, as a civilian-employee secretary. In December 2003, she was promoted to the position of Environmental Protection Specialist. Environmental Protections Specialists work with various "flights," or groups at Air Force bases to assure compliance with various regulations.

---

[1] The following facts are drawn from the supported statements of undisputed facts set forth in the parties' briefs. All facts are considered in the light most favorable to Fall, the pro se nonmovant.

Fall received largely positive performance reviews into 2005. In 2005, Fall's immediate supervisor was Mr. Arnie Sorenson, who was supervised by Mr. Glen Golson and Lieutenant Ronald DeClue and, at some point, Mr. Ken Nugent. Sometime after fall 2005, Fall began reporting directly to Mr. Golson.

## A.     Fall's Illness

In March 2005, Fall "experienced a complete physical and mental shutdown" characterized by overwhelming fatigue, a weak immune system, muscle weakness, gastrointestinal problems, body pain, headaches, and memory and concentration problems. She was eventually diagnosed with fibromyalgia.

As a result of her illness, Fall began missing considerable time from work. Between March 2005 and September 2006, she used 251 hours of annual leave, 206 hours of sick leave, and 480 hours of leave without pay ("LWOP"). Fall says that she began requesting what she believed to be reasonable accommodation for disability in the summer of 2005.

## B.     "Flexi-Tour" and "Maxi-Flex"

During 2005, Fall worked a "flexi-tour" schedule for the Air Force. This allowed Fall daily latitude on her start times, departure times, and how long to take for lunch, provided that she was in the office during certain "core hours" and so long as she worked forty hours per week. Start and departure times could be set on a daily basis.

During fall 2005, the Air Force required all employees on the flexi-tour program in Fall's flight to set their flexi-tour hours at the beginning of each two-week pay period. Start and departure times were still flexible, but had to be scheduled in advance. The Air Force

has produced affidavits from Mr. Nugent and Mr. Golson stating that the flexi-tour program was modified because it appeared that some employees were abusing the program, and there was no predictability as to when employees would be in the office. Fall testified that this new requirement applied to all employees in the flight who were on the flexi-tour program.

Fall refers to another type of flexible schedule, termed a "maxi-flex" schedule. Such a schedule would allow an employee to work when able, including teleworking, so long as the employee put in forty hours of work per week.

### C.     "Sexual Favoritism/Pandering Type Atmosphere"

Fall states that she was forced to work in a "sexual favoritism/pandering type atmosphere." In essence, Fall says that, beginning in 2002, two of her supervisors – Mr. Golson and Mr. Nugent – gave preferential treatment to one of Fall's coworkers. Fall complains that the preferred coworker dressed and behaved provocatively, and had a sexual relationship with Mr. Golson both at work and outside of work.

Fall emphasizes that she was exposed to this behavior daily. She also says that the preferred coworker was not required to adhere to the new flexi-tour set schedule in the fall of 2005.

This favoritism affected and disadvantaged both men and women in the flight. Both men and women registered complaint. Fall stated that she supported a male coworker's EEO complaint about this conduct.

Fall does not allege that any inappropriate sexual or gender-based comments or actions were directed specifically toward her.

**D.     Denial of Promotion**

Fall became eligible for a promotion in June 2005. She desired to have her pay grade increased from a GS-7 to a GS-9. Such a promotion "is not an automatic thing." The Air Force – via Mr. Nugent – denied Fall's request for the pay increase.

Fall states that, at the time, she was performing all of her duties and keeping up with her work despite absences. Fall believes that she was denied the promotion in retaliation for supporting her coworker's EEO complaint about the sexual favoritism and pandering.

The Air Force produced an affidavit from Mr. Nugent giving his reasons for denying the promotion: Fall was missing two to three days of work per week at the time; Fall's supervisors did not understand the nature of her health issues despite several meetings with her; Fall's flight was a "customer service type organization," and the Air Force viewed Fall's position as requiring Fall to be present in order to interact with other personnel and purchase supplies; Fall had not been in her GS-7 position for very long and Mr. Nugent did not feel she was ready for more responsibility, particularly because her work was being assigned to others because she was not available to do it.

**E.     Fall's First Administrative Complaint of Discrimination**

During her career with the Air Force, Fall filed three administrative complaints of employment discrimination. She filed the first on February 14, 2006. In her written form complaint, Fall stated that Mr. Nugent discriminated against her in that she was being denied the opportunity to work Flexi-Tour "the way it was intended to be used"; the form complaint refers to a lengthy attached statement. Fall sought (1) a promotion, effective June 2005 with

back pay, (2) reevaluation of the possibility of maxi-flex and telecommuting or any other program "allowing me to perform my duties and completing my 40 hour work week," including using the Flexi-Tour program "as it was intended."

Fall states that, at the time she filed her first administrative complaint, she raised the issue of a "sexual favoritism/pandering-type atmosphere" with the Equal Employment Opportunity ("EEO") officer. She says that he discouraged her from including this issue in her complaint, suggesting that it was not an actionable claim.

Fall's statement says that she was continuing treatment for her illness, but there was no hope for a cure. That statement indicates that Mr. Nugent denied her a promotion because she had been missing too much work and was accruing LWOP; Fall states that this happened even though she kept Mr. Nugent apprised of her condition and provided medical documentation, and even though she was performing her work successfully and was otherwise qualified. Mr. Nugent refused Fall's request for a "game plan" that would allow her to achieve the promotion under a written checklist or schedule. Fall's statement acknowledges that the promotion was not an "automatic process" and was based on performance. The statement says that she was given a mid-term appraisal, in which Mr. Sorenson indicated that changes in Fall's performance were due to missing work because of the medical condition.

Fall's statement says that, in October 2005, the personnel office suggested she apply for Family Medical Leave Act time. The statement indicates that Ms. Donna Dempsey, Lieutenant DeClue (as acting Flight Chief), and Mr. Sorenson were unsure that Fall would

qualify for a maxi-flex work schedule, including telecommuting up to two days per week, but suggested she apply for it. Fall's statement says that she did not apply because the schedule had not been previously authorized.

Fall's statement describes the change in the Flexi-Tour program within her flight. In the statement, Fall indicates her belief that some employees within her flight were not held to this strict program, and that the program did not comply with a prior program.

### F.    Fall's Family Medical Leave Act Application

Fall submitted evidence indicating that the Family Medical Leave Act was explained to her in September 2005, and that she completed FMLA forms in November 2005. In November 2005, the Air Force granted Fall 480 hours of FMLA time.

Fall states that, in November 2005, Mr. Golson tried to force Mr. Sorenson to classify Fall's FMLA absences as Absent Without Leave ("AWOL"), as opposed to LWOP, as required by the FMLA. AWOL absences were subject to discipline. As evidence of Mr. Golson trying to deny her FMLA time, Fall submits a memo, which she states she printed from her e-mail account, that purports to be a statement from Mr. Sorenson; the memo does not bear any of the usual indications of being from an e-mail account, such as headers and electronic dates and the Air Force challenges its validity, but the Court will assume it true for purposes of the Air Force's motion. The memo states that Mr. Nugent told Mr. Sorenson to mark Fall's absences as AWOL instead of LWOP, but that Mr. Sorenson refused because he determined that doing so would be prohibited by the FMLA. The memo states that Mr. Sorenson was later disciplined by Mr. Golson and Mr. Nugent under the general heading of

insubordination, though it does not say that the discipline referenced the refusal to deny Fall FMLA rights.

A December 2006 Family Medical Leave Act certification from Fall's doctor states that, beginning in March 2005, Fall was partially incapacitated most days and completely incapacitated seven to ten days per month. At one point in her briefing, Fall clarifies that she is not alleging violations of the FMLA.

### G. The Desk Audit

It appears that, in August 2006, Fall complained to the personnel flight at Whiteman about being passed over for a promotion. The personnel flight suggested a "desk audit," which would determine the level of work Fall was performing. Desk audits are performed by personnel specialists who assess the work an employee is actually performing and an appropriate pay grade for that work. The Air Force agreed to abide by the findings of Fall's desk audit.

The personnel specialist who performed Fall's desk audit, Ms. Sheila Moskwa, generated a report finding that Fall was not performing at the level of an Environmental Protection Specialist, a GS-7 position. Based on the desk audit, Fall's position was reclassified to be an Environmental Protection Assistant. Though she continued to receive the same pay as before and remained classified at a GS-7 level, a subclassification of her position changed such that she apparently had one-step less seniority than before.

Fall disputes the findings of the desk audit. She states her feeling that the desk audit was manipulated by Mr. Golson and that he made the decision to reclassify her position. Fall

testified that she believes that the reclassification of her position was inappropriate because: (1) she had seniority over another employee who should have been reclassified instead, (2) Ms. Moskwa wrote Fall's prior position description in 2003 and, with the desk audit, changed that description, and (3) Fall understood the desk audit to "wipe out" her first EEO complaint. Fall did not appeal that decision.

### H. Expiration of FMLA Time

On September 14, 2006, the Air Force wrote to Fall, informing her that her FMLA leave was nearly extinguished. The Air Force told her that it would deny additional requests for LWOP after she used all of her FMLA time.

On September 28, 2006, Fall requested discretionary LWOP outside the scope of FMLA time. She stated that she was awaiting reasonable accommodation as follows: teleworking one to two days per week, working a maxi-flex schedule, working a Flexi-Tour (four nine-hour days and one four-hour day per week), being placed on part-time status pending getting her illness under control, receiving certain modifications to her work station (changing florescent bulbs and getting a glare guard), and going on intermittent LWOP or non-pay status while awaiting accommodation.

The Air Force denied the additional leave request. The Air Force informed Fall that she had not worked the statutory minimum of 1,250 hours in the prior year to be eligible for additional FMLA time. Fall disputes the Air Force's calculation. She says that the Air Force delayed processing her request for approximately two weeks and that, had they processed it when she originally orally requested additional FMLA time, she would have qualified. The

only evidence she submits in support of her calculation is her testimony that she "believe[s]" she would have qualified if they had processed her request earlier.

The Air Force states that it understands its decision to deny additional LWOP to be discretionary. The Air Force submitted Mr. Golson's affidavit, indicating that Fall's job required forty hours of productive work on a regular basis. The Air Force also points to Air Force Instruction 36-815, § 4.1.3, which states that LWOP should be granted "only when it is apparent" that it will result in protection or improvement of an employee's health, and that granting LWOP is discretionary where it is done pending disability retirement applications or recovery from non-permanent disability.

Fall notes that another employee had accumulated more LWOP without adverse employment action. She produced records indicating that the employee was out because of a back injury at various points from November 2005 until June 2006.

## I.    Progressive Discipline

The Air Force uses a progressive discipline system. After Fall used her FMLA time and was denied LWOP, her absences were marked Absent Without Leave ("AWOL"). On November 3, 2006, the Air Force sent Fall a letter of reprimand for being AWOL on October 11 and 12. On December 5, 2006, the Air Force suspended Fall for five days for being AWOL on October 23 through November 1, as well as November 8 and 9.

## J.    Fall's Second Administrative Complaint of Employment Discrimination

Fall filed her second administrative complaint of employment discrimination on December 6, 2006. Fall claimed that a Colonel Moxley, Mr. Nugent, and Mr. Golson

discriminated against her. Fall sought a promotion and back pay, reinstatement, removal of her supervisor, removal of negative documents from her personnel file, attorney fees, and reasonable accommodation. She again attached a lengthy statement.

According to the statement, Fall had appealed the denial of her first complaint to the Equal Employment Opportunity Commission. Fall's statement says that she received a reprisal for her prior complaint.

The statement recounts Fall's prior complaint about being denied a promotion. In her statement, Fall describes the desk audit. She states that the desk audit reclassified her position, such that she would not have seniority over other personnel in an upcoming Reduction-in-Force ("RIF"). The statement says that, on the same day she met with EEO personnel to go over her claim of reprisal, Mr. Golson, Lt. DeClue, and Colonel Moxley informed Fall that her position was being abolished under the RIF. Fall's statement notes that management had not taken any action on her request for accommodation made in October 2005 and renewed again in October 2006. The statement concludes that she was being retaliated against for filing her first complaint, and discriminated against because of her disability of fibromyalgia.

The statement also says that an EEO officer told Fall that she could receive her promotion dated back to June 2005, but without back pay, but that Fall refused this option because a maxi-flex schedule and telework were not available.

Fall says that, at this time, an EEO officer again discouraged her from including a claim based on a "sexual favoritism/pandering-type atmosphere."

### K.    Fall's Termination

On January 9, 2007, the Air Force notified Fall that she would be terminated, effective February 16, 2007, for being AWOL on November 14 to 15, 20 to 22, 28 to 30, and on December 6 to 8, 19 to 21, 27 to 29, and January 4.  The Air Force's stated reason for her termination was that her absences caused the need to reassign her work to other employees on numerous occasions, creating dissatisfaction among those other employees.

### L.    Fall's Third Administrative Complaint of Employment Discrimination

Fall filed her final administrative complaint of employment discrimination on May 16, 2007. Fall sought a promotion and back pay from June 2005, reinstatement, reimbursement for health and life insurance, the "end of sexual pandering,: a monetary award of $300,000, and disciplinary action against Col. Moxley, Mr. Nugent, and Mr. Golson.  She included another statement with her form complaint.

Fall's third statement goes over her history of health problems, Mr. Nugent denying her promotion, and her prior two complaints.  In the statement, Fall says that Mr. Nugent required Mr. Sorenson to begin denying Fall LWOP for absences, and to mark her absences as AWOL.  The statement says that Mr. Nugent retaliated against Mr. Sorenson for supporting Fall.  Fall indicates that, after the second complaint, management refused to classify her leave as LWOP, instead marking her AWOL and subjecting her to an official reprimand and five-day suspension.

The statement says that Mr. Golson and Mr. Nugent did not discuss Fall's request for accommodation until December 2007.  The statement says that she received minimal

rearrangement of her work station, but that Mr. Golson and Mr. Nugent were not accommodating with regard to Fall's work schedule. She says that they denied her request for a three- to twelve-month leave of absence. In her statement, Fall says that Mr. Nugent and Mr. Golson continued to retaliate against her in giving the stated reason for her termination as "gross misconduct," which left her without unemployment benefits and which Fall believed rendered her ineligible for future federal employment.

Fall's statement also says that she believed she was discriminated against in that she worked in a "sexual pandering type atmosphere." Fall was certain that her support of her male coworker's EEO complaint about the preferential treatment motivated Mr. Nugent further in his retaliation.

In her statement, Fall also indicates that she was unwilling to accept the Air Force's offer of a promotion without backpay because management would not agree to a maxi-flex schedule with telework. The statement indicates Fall's belief that the desk audit was set up as a means of justifying the failure to promote Fall, and to get rid of her in the RIF.

Fall's statement details her history with the EEO office, indicating that those investigating her claim had been biased and that she was dissatisfied with the process.

## M.    Disability Paperwork

Back in September 2006, Fall had begun preparing paperwork to apply for disability retirement from the Federal Employees Retirement System ("FERS"). At that time, she believed she was being targeted for removal. In the September 2006 paperwork, Fall

indicates that her disability from working with the Air Force began in March 2005, with the onset of her fibromyalgia.

In a December 2006 FMLA health care provider certification, Fall's doctor indicated that Fall's condition commenced in March 2005, and that Fall "will not be able to work full time" for an "unknown" period of time. In a June 2007 "Letter of Medical Documentation," Fall's doctor stated that Fall's fibromyalgia and depression rendered her disabled and unable to work more than two consecutive hours without rest. Fall's doctor stated that Fall "may" improve with further treatment.

Fall says that she was waiting to see if she would receive the accommodations she requested, and did not file the FERS disability paperwork until March 2008. Fall believes that, had she been given the accommodation she requested beginning in 2005, her condition would not have worsened to the point of disability.

The Air Force supported Fall's application for disability retirement, reporting that her absences from work had been unacceptable since March 2005. Fall was granted disability retirement and currently receives disability retirement benefits.

### N.    Fall's Complaint

Fall filed her one-page pro se Complaint on June 10, 2008, attaching a final administrative decision of her claim by the Department of Defense. She alleges that the Air Force discriminated against her based on disability, retaliated against her for supporting a co-worker's EEO complaint, retaliated against her for filing her own EEO complaints, and forced her to work in a sexually pandering type atmosphere. She specifies various dates on

13

which this misconduct occurred, which correspond to the allegations she made in her administrative complaints as follows: June 25, 2005, failure to promote; October 1, 2005, denial of Flexi-Tour; August 8, 2006, job reclassification; September 16, 2006, denial of LWOP; and February 16, 2007, termination. Fall does not list a statutory basis for her claims

## II.     Discussion

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of demonstrating there is no genuine issue of material fact. *Anderson v. Liberty Lobby, Inc*., 477 U .S. 242, 256 (1986). If the moving party satisfies its burden, Rule 56(e) requires the nonmoving party to respond by submitting evidentiary materials that designate "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986). When considering a motion for summary judgment, the Court must scrutinize the evidence in the light most favorable to the nonmoving party and the nonmoving party "must be given the benefit of all reasonable inferences." *Mirax Chem. Prods. Corp. v. First Interstate Commercial Corp.*, 950 F.2d 566, 569 (8th Cir. 1991). While *pro se* pleadings are held to a less stringent standard than those drafted by attorneys*, Haines v. Kerner*, 404 U.S. 519, 520-21 (1972), *pro se* plaintiffs faced with summary judgment motions must present evidence establishing that they could prevail at trial, and may not rely on conclusory

allegations and unsupported assertions alone, *Dunavant v. Moore*, 907 F.2d 77, 80 (8th Cir. 1990).

### A.      Disability Discrimination – Failure to Accommodate and Retaliation

Fall alleges that the Air Force is liable for failing to accommodate her disability and for retaliating against her for exercising her rights as a disabled person.  These claims arise under Section 501 of the Rehabilitation Act.  Section 501 is the exclusive remedy for federal employees alleging disability discrimination by a federal agency.  *See Taylor v. Small*, 350 F.3d 1286, 1291 (D.C. Cir. 2003).  Like the Americans with Disabilities Act ("ADA"), the Rehabilitation Act prohibits employers from discriminating against a qualified individual with a disability because of that disability.  *Buboltz v. Residential Advantages, Inc.*, 523 F.3d 864, 868 (8th Cir. 2008) (citing 42 U.S.C. § 12112(a); 29 U.S.C. § 794).  Courts hold the ADA and Rehabilitation Act interchangeable, and the same analysis applies to claims under both.  *Id.*

### 1.      Judicial Estoppel

The Air Force argues that Fall's disability claims are barred by judicial estoppel because she has applied for and received FERS disability retirement.  To receive disability retirement, regulations require that employees be *unable* to perform their jobs even with reasonable accommodation.  *See Holmes-Martin v. Leavitt*, 569 F. Supp. 2d 184, 194 (D.D.C. 2008) (citation omitted).  In contrast, to state a claim for failure to accommodate, a plaintiff must demonstrate that he or she is *able* to perform the essential functions of employment with or without reasonable accommodation.  *See* 42 U.S.C. § 12111(8).  Thus, courts have

held that employees' disability retirement admissions that they are unable to work preclude disability claims. *See, e.g., Serino v. Potter*, 178 Fed. Appx. 552, 555-56 (7th Cir. 2006) (finding that disability retirement precluded claims for reinstatement and back pay).

In response, Fall argues that she did not file for disability retirement until 2008. She contends – albeit without evidentiary support – that she could work with reasonable accommodation up until her termination, but that the continued stress of the Air Force's failure to accommodate worsened her condition to the point that she became unable to work. For purposes of this motion, the Court will consider the substance of her disability claims.

### 2.    Failure to Accommodate

Fall attempts to argue claims for failure to accommodate and retaliation under the Rehabilitation Act.[2]  The Rehabilitation Act "compels employers to modify their work requirements to enable disabled individuals to have the same opportunities as their non-disabled counterparts." *Peebles v. Potter*, 354 F.3d 761, 767 (8th Cir. 1994).  The analysis of such claims focuses on whether the employer failed to fulfill an affirmative duty to reasonably accommodate. *Id.*

The Rehabilitation Act requires employers to accommodate a "qualified individual with a disability."  "Qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential

---

[2]  It does not appear that Fall is attempting to state a disparate treatment claim under the Rehabilitation Act, as she does not argue that she was treated differently than similarly-situated less- or non-disabled individuals because of her disability.  *See Peebles v. Potter*, 354 F.3d 761, 766 (8th Cir. Mo. 2004).

functions of the employment position that such individual holds or desires." *See* 29 C.F.R. § 1630.2(m). "Reasonable accommodation" includes "job restructuring" and "part-time or modified work schedules." 29 C.F.R. § 1630.2(o). To establish a claim for disability discrimination (under either a failure-to-accommodate or disparate-treatment theory), Fall must show, among other elements, that she is qualified to perform the essential functions of her position, with or without reasonable accommodation. *See Didier v. Schwan Food Co.*, 465 F.3d 838, 841 (8th Cir. 2006).

The Rehabilitation Act "demands a great deal from federal employers in the way of accommodation," including considering telework as a potential accommodation in appropriate cases. *Carr v. Reno*, 23 F.3d 525, 530 (D.C. Cir. 1994). But in determining essential functions of a job, "consideration shall be given to the employer's judgment." 42 U.S.C. § 12111(8). An "essential function of any government job is an ability to appear for work (whether in the workplace or, in the unusual case, at home) and to complete assigned tasks within a reasonable period of time." *Carr*, 23 F.3d at 530; *Nesser v. Trans World Airlines, Inc.*, 160 F.3d 442, 445 (8th Cir. 1998) ("We have recognized that attendance at work is a necessary job function."). Here, the Air Force has introduced evidence that Fall's being physically present for work was an essential function of her job, which required regular interaction with other personnel in a customer-service-type setting.

Further, the Air Force has introduced evidence that Fall could not perform regular work – and other essential duties – even with the accommodation she requested. The Air Force demonstrated that, from October 2005 when she first requested accommodation in the

form of a maxi-flex, Flexi-Tour, and telecommuting schedule, Fall only worked what amounted to a part-time schedule for a full-time position. The statements from Fall's doctor indicate that she was not capable of working full-time, beginning in March 2005. The Air Force has introduced evidence of her numerous absences, including AWOL absences. It has introduced evidence that other employees needed to take-on some of Fall's duties in order to meet deadlines, which caused difficulties in the workplace. Particularly, in light of the claims made in her disability paperwork – designating the onset of her disability as far back as October 2005–, there is no evidence that Fall's disability would have allowed her to work "regular hours on a consistent basis" even with the accommodation she requested. *See Carr*, 23 F.3d. at 530-31 (affirming summary judgment on a Rehabilitation Act claim based on failure to accommodate via an "open-ended [telework] 'work when able' schedule").

Where an employer shows that regular work is an essential function of a job, a plaintiff's failure to show she can work defeats her disability discrimination claim. *Piziali v. Grand View College*, 208 F.3d 218 [Table], No. 99-2287, 2000 WL 227905 at *1 (8th Cir. Feb. 11, 2000) (noting that requested accommodations were unreasonable because they would have required reassigning other employees to perform the plaintiff's duties). Fall cannot show that she could have performed the essential duties of her job, even with accommodation. Disability claims cannot survive summary judgment where employees cannot show that they can perform the essential functions of their jobs. *See, e.g., Alexander v. Northland Inn*, 321 F.3d 723, 727 (8th Cir. 2003).

Fall's disability retaliation claim is discussed below.

18

## B. Fall's Claim of a "Sexually Pandering Type Atmosphere"

Fall insists that she is not alleging sexual harassment. Rather, she argues that she has a claim based on a "sexual favoritism/pandering type" atmosphere – a hostile work environment – which she states had an equal impact on men and women in her flight. She appears to pair this claim with a corresponding retaliation claim.

Title VII prohibits discrmination based on gender. 42 U.S.C. § 2000e-2(a)(1). It is well-settled that this prohibited discrimination includes being forced to work in a hostile or abusive working environment in which one is subject to unwelcome harassment based on sex. *Anderson v. Family Dollar Stores of Ark., Inc.*, 579 F.3d 858, 862 (8th Cir. 2009); *Weger v. City of Ladue*, 500 F.3d 710, 718 (8th Cir. 2007).

But the "paramour theory" of Title VII liability – the theory that one suffers discrimination because of inappropriate behavior with, and favoring of, a paramour – has been rejected by courts, including the United States Court of Appeals for the Eighth Circuit. *See, e.g., McGinnis v. Union Pacific R.R.*, 496 F.3d 868, 874 (8th Cir. 2007) (rejecting a terminated male employee's claim based on favored treatment of younger female employees where one favored employee had an affair with a nondecisionmaker). Under this theory, plaintiffs cannot show – as required for a hostile work environment claim – that discrimination was based on gender. *See Palesch v. Missouri Comm'n on Human Rights*, 233 F.3d 560, 560 (8th Cir. 2000) (listing the elements of a hostile work environment claim, including a showing that the discriminatory treatment was based on gender). Such discrimination does not exist where members of both sexes are subject to the same

19

unfavorable conditions of employment. Put another way, "where an employee engages in consensual sexual conduct with a supervisor and an employment decision is based on this conduct, Title VII is not implicated because any benefits of the relationship are due to the sexual conduct, rather than the gender, of the employee." *McGinnis*, 496 F.3d at 874 (quoting *Tenge v. Phillips Modern Ag Co.*, 446 F.3d 903, 909 (8th Cir. 2006)).

Here, Fall confirms that both men and women in her flight found the sexual favoritism and pandering to be offensive. The conduct was not directed at Fall specifically. At least one man filed an EEO complaint about it. Fall's "sexual favoritism/pandering type atmosphere" allegations cannot succeed. *See generally Thomson v. Olson*, 56 F.3d 69 [Table], No. 94-3527, 1995 WL 296399 (May 17, 1995) (summarily affirming dismissal – at 866 F. Supp. 1267 – of a Title VII claim brought by a male employee based on the favored treatment of the supervisor's female paramour because the alleged discrimination was not based on sex); *DeCintio v. Westchester County Med. Ctr.*, 807 F.2d 304, 308 (2d Cir. 1986) (holding that male promotion candidates could not sue for discrimination under Title VII where a supervisor tailored an available position to favor his paramour, because they "faced exactly the same predicament as that faced by any woman applicant for the promotion: No one but [the paramour] could be considered for the appointment because of [his] special relationship to" the paramour); *Sherk v. Adesa Atlantic, LLC*, 432 F. Supp. 2d 1358, 1370-71 (N.D. Ga. 2006) ("Favoritism of a paramour, therefore, while perhaps unfair, is gender neutral and more akin to nepotism than sexism.").

Fall's Title VII retaliation claim is discussed below.

## C.    FMLA

To the extent Fall is asserting a claim under the FMLA, that claim fails.  Fall's briefing – at one point stating she is not asserting an FMLA claim and later arguing about FMLA violations – is not clear as to whether she is claiming a violation of her FMLA rights. Fall's administrative complaints did not attempt to state an FMLA claim.  Her Complaint and the incorporated administrative decision do not mention an FMLA claim.  *Compare Miles v. Belfontaine Habilitation Center*, 481 F.3d 1106, 1107 (8th Cir. 2007) (finding that a pro se plaintiff had sufficiently pleaded a Title VII claim where she attached her right-to-sue letter concerning the alleged discrimination).  Fall did not place the Air Force on notice of an FMLA claim, as she did not raise FMLA allegations until her response brief.

Even if Fall had adequately pleaded an FMLA claim, it could not survive summary judgment.  The FMLA imposes liability on "any person who acts, directly or indirectly, in the interest of an employer to any of the employees of such employer." 29 U.S.C. § 2611(4)(A)(ii)(I).  There are two types of FMLA claims: interference claims, asserting that employers denied or interfered with substantive FMLA rights; and retaliation claims, asserting that employers discriminated because of engaging in activity protected by the FMLA.  *Stallings v. Hussman Corp.*, 447 F.3d 1041, 1050 (8th Cir. 2006).  *But see Scobey v. Nucor Steel-Arkansas*, 580 F.3d 781, 790 (8th Cir. 2009) (questioning whether FMLA interference claims are, as courts including the Eighth Circuit have held, separate from FMLA retaliation claims: "Under the statute, retaliation for exercising one's FMLA rights appears to be just one aspect of what is meant by 'interference,' not a separate claim.").

Fall says that the Air Force interfered with her rights under the FMLA in November 2005, when Mr. Golson or Mr. Nugent attempted to have Mr. Sorenson deny Fall FMLA rights. But she does not indicate that they succeeded and thereby denied her FMLA time. She also says that the Air Force improperly denied her a second round of FMLA time based on her belief that it miscalculated her hours.

To prevail on a FMLA interference claim, Fall must show that 1) that she was "eligible" for FMLA benefits – that is, that she had been employed for at least a year and worked at least 1,250 hours during the previous twelve-month period, 29 U.S.C. § 2611(2)(A) ; 2) that the Air Force is an "employer"; 3) that she was entitled to leave under the FMLA; 4) that she gave the Air Force notice of intent to take FMLA leave; and 5) the Air Force denied the employee benefits to which she was entitled. *Hoge v. Honda of Am. Mfg., Inc.*, 384 F.3d 238, 244 (6th Cir.2004).

As to the November 2005 attempt to get Mr. Sorenson to deny FMLA time, any interference claim fails on the last of these elements. Fall introduces no evidence that she actually was denied that time, or that the attempt otherwise impacted her. Even the purported memo from Mr. Sorenson does not indicate that Fall was denied FMLA rights.

As to the denial of a second round of FMLA time, any interference claim fails because Fall cannot establish that she was an eligible employee or that she was entitled to FMLA time. The Air Force has produced evidence that Fall was not entitled to a second round of FMLA time, including an affidavit from Mr. Golson indicating that the Air Force worked with its legal department to determine Fall's eligibility for FMLA leave, and a letter from Mr.

Golson indicating that a review of Fall's records showed that she had only worked 1,207 hours. Fall's best evidence that the Air Force was wrong is her statement that she believes that she would have been entitled to more FMLA time if the Air Force had calculated her entitlement at the time she made her oral request. She produces no records indicating that she had worked the requisite 1,250 hours – despite the absences caused by her disability – in the year prior to her oral request. Fall cannot succeed on an interference claim.

Fall's FMLA retaliation claim is discussed below.

### D.    Retaliation

Fall argues that the Air Force retaliated against her. She believes that this retaliation sprung from her requesting reasonable accommodation, requesting FMLA time, and complaining of the sexual favoritism and pandering. She indicates that this retaliation manifested in the adverse employment actions of reclassifying her position, denying her additional flexibility in her work schedule – including telework, additional FMLA time, and LWOP –, and terminating her.

In addition to pointing out the adverse actions listed above, Fall points to other factors in support of her retaliation claims. She produced records of another employee who was allowed more LWOP from November 2005 until June 2006 with a back injury. She argues – without evidence – that another employee had less seniority and so that employee's position, rather than Fall's, should have been reclassified. Finally, she argues that Ms. Moskwa's participation in the reclassification of her position was suspect because Ms.

Moskwa had written the original position description in 2003, before the onset of Fall's disability and before the desk audit evaluating the work Fall was actually performing.

The Rehabilitation Act, Title VII, and the FMLA all prohibit retaliation against employees for engaging in protected conduct. The Rehabilitation Act prohibits discrimination against any individual because the individual has opposed any discriminatory employment action or practice, or made a charge of discrimination. 29 U.S.C. § 794(d) (incorporating the ADA's 42 U.S.C. § 12203(a)). Title VII prohibits retaliation against employees who file charges of discrimination or assist others in opposing discrimination. 42 U.S.C. § 2000e-3(a). The FMLA prohibits employers from taking adverse employment action against individuals for opposing practices made unlawful by the FMLA. 29 U.S.C. § 2615(a)(2). *But see Scobey*, 580 F.3d at 790 (questioning whether the FMLA provides retaliation claims separate from interference claims).

Under each claim, Fall must ultimately show that there is a causal connection between her protected activity and the adverse employment actions of which she complains. *See Robinson v. Potter*, 453 F.3d 990, 994 (8th Cir. 1990) (Rehabilitation Act); *Arraleh v. County of Ramsey*, 461 F.3d 967, 977 (8th Cir. 2006) (Title VII); *Darby v. Branch*, 287 F.3d 673, 679 (8th Cir.2002) (FMLA). To resolve that limited issue, the Court must apply the burden shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *See Robinson*, 453 F.3d at 994 (Rehabilitation Act); *Lewis v. Heartland Inns of America, L.L.C.*, 591 F.3d 1033, 1042 (8th Cir. 2010) (Title VII); *Phillips v. Matthews*, 547 F.3d 905 (8th Cir. 2008) (FMLA).

For purposes of that analysis, the Court will assume that Fall has established a prima facie case and will turn directly to the Air Force's stated nondiscriminatory reasons for its actions. The burden on the Air Force in naming nondiscriminatory reasons is "one of production, not persuasion." *See Cherry v. Ritenour Sch. Dist.*, 361 F.3d 474, 478 (8th Cir. 2004).

The Air Force articulates nondiscriminatory reasons for the actions about which Fall complains. It has produced evidence that it relied on the results of the desk audit – a desk audit performed by a personnel specialist and prompted by Fall's complaint about not being promoted – in reclassifying her position. *See, e.g., Hawkins v. Holder*, 597 F. Supp. 2d 4, 18-19 (D.D.C. 2009) (considering an employer's reliance on a desk audit as establishing a nondiscriminatory reason for adverse action).

The Air Force also offers nondiscriminatory reasons for denying Fall's requested accommodation. The Air Force states that – at least as its records showed – Fall was not eligible for additional FMLA time. *See Phillips v. Mathews*, 547 F.3d 905, 913 (8th Cir. 2008) (finding that an FMLA plaintiff had not shown that the employer's stated reason for termination – unexcused absence – was pretextual even where the plaintiff could show that leave time was available because the employee did not show that the employer was aware of the available leave). The Air Force points to the discretionary nature of granting additional LWOP when it was not apparent – in light of Fall's deterioration despite significant leave – that it would have resulted in protection or improvement of an employee's health, and where it would have been done pending disability retirement applications or

recovery from any non-permanent disability. *See* Air Force Instruction 36-815, § 4.1.3. The Air Force's decision to deny LWOP, flexible schedules, and telework must be considered in light of Fall's supervisors' belief that she needed to be present at work in order to perform the essential functions of her job. *See Woodruff v. Peters*, 482 F.3d 521, 531 (D.C. Cir. 2007) (affirming summary judgment on a Rehabilitation Act claim for failure to accommodate and disability retaliation based, in part, on an employer's failure to offer a flexible work schedule where the employer produced evidence that the employee needed to be present in order to perform essential job functions).

As to termination, the Air Force states that it resulted from Fall's failure to comply with job requirements despite progressive discipline. Fall continued to have numerous unauthorized absences after her reprimand and suspension. While employers should consider medical leave of absence, they are not required "to provide an unlimited absentee policy." *See Brannon v. Luco Mop Co.*, 521 F.3d 843, 849 (8th Cir. 2008) (citation omitted).

With the Air Force having stated nondiscriminatory reasons for its conduct, the burden shifts to Fall to identify evidence from which a trier of fact could find that the Air Force's reasons were pretext for discrimination. Fall must be able to show "by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 136 (2000). Employees seeking to show pretext may do so in several ways; for example:

An employee may prove pretext by demonstrating that the employer's proffered reason has no basis in fact, that the employee received a favorable review shortly before he was terminated, that similarly situated employees who did not engage in the protected activity were treated more leniently, that the employer changed its explanation for why it fired the employee, or that the employer deviated from its policies.

*Stallings*, 447 F.3d at 1052.

The closest Fall comes to doing so is in her raising a comparison to two other employees. First, she argues that another employee – out with a back injury from November 2005 to June 2006 – was allowed to take more LWOP than Fall was. Fall does not indicate that this employee was similarly situated in terms of his position, his illness, or any protected activity; at a minimum, that employee's eight months of absences does not serve as a strong comparison with Fall's fifteen months prior to termination. She argues that another employee with less seniority should have been reclassified rather than Fall, but offers no evidence that this would have been an appropriate procedure. Fall does not indicate that any other employee was allowed to telework or work on the type of flexible schedule she requested. She does not offer evidence – as opposed to her belief – that the audit failed to follow appropriate procedures. She does not offer evidence that the Air Force did not believe that she needed to be present at work or that she could not perform her duties even if it had accommodated her as she requested.

Certainly, the alleged retaliation followed Fall's complaints and requests for accommodation. But mere temporal proximity is not enough to rebut an employer's proffered legitimate, non-discriminatory reasons for adverse employment action under the

ADA.  *See Woodruff*, 482 F.3d at 531 ("Assuming the intention behind the ADA's retaliation provisions was to protect the remedial scheme but not to create a permanent discipline-free zone for complainants, we conclude positive evidence beyond mere proximity is required to defeat the presumption that the proffered explanations are genuine.").  Fall simply has not produced evidence from which a reasonable finder of fact could find that the Air Force retaliated against her for engaging in protected activity.

### E.    EEO Misconduct

In her response brief, Fall alleges misconduct by Air Force EEO officers in addressing her complaints.  Fall did not raise any such claim in her Complaint.  The alleged mishandling of her Complaint by EEO officers unrelated to her discrimination claims does not support those claims.  Even if she had attempted to allege mishandling as a separate claim, it would fail.  *See, e.g., Chennareddy v. Dodaro*, — F. Supp. 2d —, No. 87-3538 (EGS), 2009 WL 5439340 (D.D.C. Dec. 18, 2009) (finding no cause of action against the Government Accountability Office's Personnel Appeals Board for challenges to its processing of Title VII and Age Discrimination in Employment claims); *Cole v. Powell*, 605 F. Supp. 2d 20, 26 (D.D.C.  2009) (holding that Title VII did not provide a cause of action for failure in EEO procedures and investigations); *Rockefeller v. Abraham*, 58 Fed. Appx 425, 428 (10th Cir. 2003) (stating that even violations of federal regulations concerning federal employees' EEOC complaints do not give rise to independent claims under Title VII).

### III.    Conclusion

Accordingly, it is hereby ORDERED that the Air Force's motion for summary judgment [Doc. # 48] is GRANTED.


                                        s/ Nanette K. Laughrey
                                        NANETTE K. LAUGHREY
                                        United States District Judge

Dated:  July 13, 2010
Jefferson City, Missouri